384 F.2d 66
 In the Matter of ATLAS SEWING CENTERS, INC., Debtor.
JONES FINANCIAL CORPORATION, Appellant,
v.
Irwin RAY, as Trustee in Bankruptcy for Atlas Sewing Centers, Inc., Appellee.
The CHASE MANHATTAN BANK, Appellant,
v.
Irwin RAY, as Trustee for Atlas Sewing Centers, etc., et al., Appellees.
UNITED STATES of America, Appellant,
v.
Irwin RAY, Appellee.
Irwin RAY, Trustee in Reorganization of Atlas Sewing Centers, Inc., Appellant,
v.
JONES FINANCIAL CORPORATION, Appellee.
J. Charles BURDEN, Jr., Appellant,
v.
Irwin RAY, Trustee in Reorganization of Atlas Sewing Centers, Inc., et al., Appellees.
 No. 24157.
 No. 20936.
 No. 22852.
 No. 23891.
 No. 24449.
 No. 24495.
 United States Court of Appeals Fifth Circuit.
 June 30, 1967.
 Rehearing En Banc Denied July 12, 1967.
 
 George F. Meister, Harry L. Durant, Miami, Fla., Harold M. Hoffman, New York City, Jack M. Gordon, New Orleans, La., for Jones Financial Corp.
 J. Charles Burden, Jr., David A. Sheffield, Alexandria, La., for J. Charles Burden, as co-proponent, and Atlas Sewing Centers, Inc.
 Paul Gonson, S. E. C., Washington, D. C., for Securities and Exchange Commission.
 John H. Gunn, Miami, Fla., for Bank Creditors group.
 Walter Beckman, Miami, Fla., for Horace F. Cordes, receiver.
 Feibelman, Friedman, Hyman & Durant, Paul G. Hyman, Miami, Fla., for Associates Discount Corp.
 Mitchell Rogovin, Asst. Atty. Gen., Tax Div., Dept. of Justice, Washington, D. C., Lee A. Jackson, Chief, Appellate Section, Dept. of Justice, Washington, D. C., William A. Meadows, Jr., U. S. Atty., Miami, Fla., Edward A. Kaufman, Asst. U. S. Atty., Miami, Fla., Fred B. Ugast, Atty., Dept. of Justice, Washington, D. C., for the United States.
 Wm. P. Simmons, Jr., and Garrette J. Wimpey, of Shutts & Bowen, Miami, Fla., for Chase Manhattan Bank.
 Before BROWN, GOLDBERG and AINSWORTH, Circuit Judges.
 JOHN R. BROWN, GOLDBERG and AINSWORTH, Circuit Judges.
 
 
 1
 This appeal is from the findings and order of the district court resulting from our remand, by several orders, of all matters involved in the several cases growing out of the bankruptcy proceedings of Atlas Sewing Centers, Inc. The appeal consolidates all of the remaining matters at issue in these cases, with but two exceptions: (1) The question whether Atlas is finally to be adjudicated a bankrupt, which is now set for hearing in district court on July 13, 1967, and (2) the question of whether the onetime Trustee in Bankruptcy is to be held in civil and criminal contempt of this Court, concerning which we emphasize that we here make no finding, conclusion, or judgment at this time.
 
 
 2
 The first shot was fired on June 22, 1962, when Atlas filed a voluntary petition for reorganization under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., in the District Court for the Southern District of Florida. Atlas, a Delaware corporation with its principal place of business in Miami, Florida, was engaged primarily in retail sales of sewing machines through local outlets throughout the United States (and including Puerto Rico). Customers generally bought the machines by installments, using installment sales contracts or chattel mortgages.
 
 
 3
 On December 4, 1961, about six months before the filing of the Chapter X petition, Atlas had entered into a financing agreement with the Jones Financial Corporation, whereby Jones lent money to Atlas in return for the pledge of installment sales security agreements. Atlas had to pledge $2.86 of paper for each $1.00 lent, and the agreement also provided for daily reports from Atlas, separate bank accounts, accounting for all repossessions, and attorney's fees. Jones made an initial advance of $250,000 under this agreement, and continued to lend substantial sums.
 
 
 4
 After the filing of the voluntary petition on June 22, 1962, (when the outstanding indebtedness was $431,780.) the Trustee, Irwin Ray, sought to procure additional financing from Jones. Jones and the Trustee agreed to recognize the priority of the December 4, 1961, agreement, and entered into a new financing agreement, dated August 16, 1962, which was similar to the December 4 agreement except that collateral was required at 200 per cent of the sum lent rather than 286 per cent. On August 20, the District Court authorized the Trustee to enter into the new agreement.
 
 
 5
 Further large sums of money were advanced under the new agreement, amounting in the aggregate to more than $600,000.
 
 
 6
 On June 4, 1963, however, Jones filed a petition in District Court requesting relief because the Trustee was disregarding the financing agreement by failing to deposit collections in the special bank account and instead commingling those funds, by failing to keep the proper two-to-one ratio of collateral to loan, and by failing to account for repossessed merchandise and indeed by repledging the repossessed merchandise as security with other lenders.
 
 
 7
 The District Court held a hearing and on September 18, 1963, entered an order denying any relief to Jones. The same day Jones filed a notice of appeal to this Court. This appeal, questioning the denial by the District Court of Atlas's petition for enforcement of its financing agreement, was numbered 20936. On October 4, Jones filed with this Court a request for interim relief to prevent irreparable harm. On October 11, this Court granted that request, ordering
 
 
 8
 "The Trustee, Irwin Ray, Appellee, shall forthwith and henceforth (i) deposit and retain intact in a special account all collections representing proceeds of collateral assigned to Jones Financial Corporation, appellant; (ii) segregate and set apart all repossessed merchandise which is the subject of collateral assigned to Jones Financial Corporation, appellant, under the financing contract dated August 16, 1962 with Jones Financial Corporation; (iii) deposit in said special account any funds presently in the Trustee's hands derived from the sale of repossessed merchandise covered by installment contracts previously assigned to Jones Financial Corporation as collateral under the financing contract dated August 16, 1962."
 
 
 9
 The Trustee moved to dismiss the appeal, filing a brief in support of the motion. Jones filed a reply brief on this issue. On December 23, we held that the motion to dismiss would be carried with the case. The order granting interim relief remained in effect.
 
 
 10
 On January 29, 1964, Jones filed with this Court a petition for a rule to show cause why the Trustee should not be held in contempt of the October 11, 1963, order granting the requested interim relief. Annexed to the petition were two affidavits: one by George F. Meister, Jones's Miami attorney, and the other by Walter S. Seidman, Jones's president. Both affidavits claimed that the Trustee had flagrantly violated the October 11, 1963, order. After a response by the Trustee, and an answering affidavit from Seidman, we ordered, on February 26, 1964, that David W. Dyer, then District Judge, serve as Special Master to hold hearings and to report his findings and conclusions on the question of whether the Trustee had violated our October 11, 1963 order.
 
 
 11
 Judge Dyer held hearings forthwith, and reported on March 12 1964, that the Trustee had violated one of the provisions of the October 11 order in that the Trustee had failed to segregate the proceeds of sales of collateral under the December 4, 1961, financing agreement.
 
 
 12
 Upon receipt of Judge Dyer's report we ordered, on March 25, 1964, that any party might file objections to the report, and that the civil contempt proceeding would be heard along with the argument of the appeal in No. 20936 on its merits, on April 15, 1964.
 
 
 13
 On April 15, the Trustee filed a report of compliance with the October 11, 1963, order. On April 16, we held that the Trustee should segregate the proceeds from collateral under the December 4, 1961, financing agreement, in accordance with the October 11 order, and ordered the Trustee to file within 20 days a report of compliance. We also ordered: "Upon receipt of said report and any objections thereto, the rule for civil contempt will be marked submitted."
 
 
 14
 On May 5, 1964, the Trustee reported his compliance.
 
 
 15
 On May 8, 1964, came the first appearance of the matters most germane to the present action. On that date J. Charles Burden, Jr., and the Trustee, as co-proponents, filed a plan of corporate reorganization of Atlas.
 
 
 16
 On May 15, Jones objected to the Trustee's May 5 report of compliance with the October 11, 1963, order. On June 17, Jones supplemented these objections with a report, supported by affidavits, which claimed that the Trustee and the Vice-President of Atlas, Mrs. Charlotte Blackburn, had secreted certain ledger cards recording individual sales which had been paid in full. The effect of such secretion, according to Jones, was that substantial sums of money collected by Atlas, and owing to Jones, were concealed.
 
 
 17
 On June 19, 1964, the District Court held a hearing on the feasibility of the reorganization plan. At that hearing, Burden testified that he had deposited $100,000 which he had promised as an earnest of his good faith. He promised that he would provide an additional $900,000 for the company within 48 to 72 hours thereafter.
 
 
 18
 On June 23, we ordered the Trustee to reply to Jones's renewed charge of malfeasance within ten days. The Trustee replied on July 6, denying the allegations. On August 3, this Court approved Judge Dyer's findings of March 11, and in the light of the new allegations by Jones again referred to Judge Dyer as Special Master, the question of compliance with the October 11, 1963, order.
 
 
 19
 On August 4, 1964, the day after we re-referred the contempt matter to Judge Dyer, Burden and the Trustee, as co-proponents, filed in District Court an amended plan of reorganization. Under this plan, Burden was obligated to pay to the reorganized company $1,000,000 immediately. The plan further provided:
 
 
 20
 The said J. Charles Burden, Jr., does further obligate himself, should the Continuing and Reorganized Company be in need of additional working capital, subsequent to the expenditures required and provided for by this instant Plan, or any Plan subsequently amended or modified, be approved by J. Charles Burden, Jr., to advance to the Continuing and Reorganized Company, in accordance with appropriate corporate acceptance, as contained in such resolutions as are adopted by the Board of Directors, an additional amount of $1,250,000.00
 
 
 21
 For his contribution, Burden was to receive 51 per cent of the stock of the newly reorganized Atlas. Of the remaining stock, 42 per cent was to go to a group of banks and other financing institutions. Atlas owed these banks and other institutions about 11.5 million dollars, secured by an assignment of Atlas receivables made in November, 1960.[1] These banks and institutions were to receive the stock in proportion to the debts owed them. Four per cent of the new stock was to go to the Atlas bondholders, and three per cent to its old stockholders. On the same day, August 4, the District Court approved the amended plan.
 
 
 22
 On September 4, 1964, the District Court issued an order confirming the plan. This order recognizes that Jones is a creditor under the August 16, 1962, financing agreement, but fails to mention Jones as a secured creditor under the pre-bankruptcy financing agreement of December 4, 1961. However, the plan provided that William O. Mehrtens (now Judge Mehrtens) be appointed Special Master to determine the amount, validity, and priority of all claims of would-be secured creditors.
 
 
 23
 The order finally gave Atlas the option of paying off the Jones claim under the August 16, 1962, agreement in one of several fashions. Atlas was given until September 30, 1964, to choose which mode of payment it preferred.
 
 The order provided in part:
 
 24
 "36. That the title to the property dealt with by the said Amended Plan shall be vested with the Continuing and Reorganized Company on such date as the Reorganization Managers, with the approval of the Court, may determine, and the said property, when transferred by the said Trustee to the Continuing and Reorganized Company, shall be free and clear of all claims and interests of the said Debtor, creditors, stockholder, except such claims and interests as may otherwise be provided for in the said Amended Plan, or in the order directing or authorizing the transfer or retention of such property."
 
 
 25
 When the court confirmed the plan, it was expected that Burden would provide forthwith the $900,000 needed for consummation and operating expenses. At the time of this order, the Trustee, short of funds, was borrowing from certain of Atlas's escrow accounts.
 
 
 26
 Burden gave the Trustee a check for $150,000 on September 4, as a payment towards the $900,000. This check was dishonored when presented for payment. Burden made no payments between 48 and 72 hours after the plan was confirmed; in fact he contributed nothing until November 6, 1964, when he paid in the sum of $400,000.
 
 
 27
 On September 30, 1964, Atlas decided, as an option granted by the September 4, 1964, District Court order confirming the plan of reorganization, that it would pay Jones in cash all of the money owed under the August 16, 1962, financing agreement, and would, upon payment, obtain a release from Jones of all of Jones's collateral held under that agreement.
 
 
 28
 On October 1, 1964, Jones filed a notice of appeal from the September 4 order confirming the plan of reorganization. In Jones's memorandum of January 10, 1967, the reasons stated for this appeal are given as:
 
 
 29
 "Basically, Jones filed this appeal because the plan did not adequately protect Jones' claim under the financing agreement dated December 4, 1961, erroneously placed in issue the validity of Jones' claim under such contract, did not protect Jones' administrative claim under the financing agreement of August 16, 1962, and required Jones to surrender its collateral held under the August 16, 1962, agreement prior to the time its administrative expenses existing under such agreement had been paid in full."
 
 
 30
 In November, 1964, pursuant to our order of August 3, 1964, Judge Dyer as Special Master held his second set of hearings on the question of whether the Trustee was disobeying or had disobeyed our order of October 11, 1963. On December 19, 1964, an organizational meeting of the reorganized Atlas was held. Burden was elected chairman of the board, president, and treasurer. On December 22, Burden supplied the remaining $500,000, fulfilling finally his obligation to contribute $1,000,000 at the outset of the reorganized Atlas.
 
 
 31
 On December 31, 1964, the District Court entered an "Order in aid of Consummation of the Plan." In this document (a) the District Court estimated that under the December 4, 1961, financing agreement, Atlas owed Jones $30,085.92 principal, $47,123.02 interest, and noted Jones's claim of an attorney's fee for which the Court reserved $15,000, totalling $92,208.98; (b) the Court found that under the August 16, 1962, financing agreement, Atlas owed $305,894.90 principal, $85,817.72 interest, and noted Jones's claim of an attorney's fee against which the Court reserved $25,000, totalling $416,712.62. The Court ordered that the sum of these two totals, or $508,921.60, be deposited into the registry of the District Court by Atlas. It also ordered that once this sum was deposited, interest charges on the financing agreements would cease.
 
 
 32
 The Court further ordered that upon release by Jones of all of its claims for collateral under the August 16, 1962, financing agreement, $388,751.78 of the registry fund would be paid to Jones. The $25,000 fund set aside for attorney's fees was to await a finding by the District Court on their allowability.
 
 
 33
 The Court further held that the $92,208.98 deposited in respect of the December 4, 1961, financing agreement be held in escrow awaiting the decision by Special Master Mehrtens on the validity of Jones's claim based on that agreement.
 
 
 34
 The appropriate sum was deposited, and on January 5, 1965, Jones gave a receipt for $397,750.63,[2] and released its claim on the collateral under the August 11, 1962 financing agreement.
 
 
 35
 On January 22, 1965, the Trustee assigned and transferred to the reorganized company all of the Atlas assets, except two bank accounts and control over the litigation against the Beneficial Finance Company. On February 1, a new set of books was established for the reorganized company, into which were merged all previous books and records.
 
 
 36
 On January 13, Irving M. Wolff, as attorney for Banco Popular de Puerto Rico,[3] a creditor which had intervened earlier, moved in this Court that both of the appeals in No. 20936 be dismissed as moot, because Jones was by the December 31, 1964, order in consummation of the plan, assured of payment in full. On January 18, the Trustee joined in this motion. On January 25, Jones responded, stating that the appeals were not moot because the contempts remained to be decided, and because the order in aid of Consummation of the Plan provided that interest should cease to accrue after December 31, 1964, in contravention of the financing agreements. On January 26, Jones appealed from the December 31, 1964, Order in Aid of Consummation of the Plan.
 
 
 37
 On February 3, 1965, we held that the motion to dismiss be carried with the case "at least until this Court has received and reviewed the report and recommendations relating to the contempt proceedings involved herein which may hereafter be filed by the Honorable David W. Dyer, United States District Judge, as Special Master, or until the further order of this Court."
 
 
 38
 Judge Dyer reported on March 4, 1965, on the Trustee's compliance with the October 11, 1963, order. Judge Dyer's findings disclosed substantial disregard by the Trustee, of the order, including commingling of funds supposed to be separated, concealment of records, and failure to account for funds received.
 
 
 39
 Having received Judge Dyer's report, this Court ordered, on March 12, 1965, that Irwin Ray as Trustee and individually, and Charlotte Blackburn, show cause why "an order for the institution of civil and/or criminal contempt proceedings should not be entered" against them.
 
 
 40
 On July 1, 1965, the district court entered its "Order of Substantial Consummation of the Plan." This order projected transferral of control of Atlas, in form and substance, and including the Beneficial litigation, from the Trustee to the reorganized company headed by Burden. However, except for the title of the order, all references to consummation of the plan are conditioned on the happening of future events. The order stated, in paragraph 7, "That the Assignment, executed by the Trustee on January 22nd, 1965, and heretofore approved by the Honorable Emett C. Choate, * * * shall become effective in accordance herewith when the payments hereinabove set out to be made in cash are actually paid by the Continuing and Reorganized Company [Atlas]."[4]
 
 
 41
 The court retained jurisdiction, even upon the conditional consummation, over the determination of secured creditors, all matters pending appeal, the contests for attorneys' fees, and administrative matters.
 
 
 42
 On September 28, 1965, this Court held that in the light of the developments in the case, that the United States Attorney for the Eastern District of Louisiana institute criminal contempt proceedings against Irwin Ray, charging him with contumacious failure and refusal to comply with our order of October 11, 1963. We also held that the submission on its merits on April 15, 1964, of the original appeal of No. 20936 (the original appeal was from the District Court's order of September 18, 1963, denying relief to Jones) be vacated and set aside, and that it be consolidated with the appeal from the District Court's order of September 4, 1964, confirming the plan of reorganization.
 
 
 43
 On October 8, 1965, came the report by Special Master (now Judge) Mehrtens. Judge Mehrtens found that the December 4, 1961, financing agreement between Jones and Atlas was valid, and that Atlas still owed Jones $30,085.92 as a principal sum (the identical amount estimated as due under this agreement by the District Court in its order in Aid of Consummation of the Plan of December 31, 1964). The Master also found that interest in the sum of $50,279.65 was due for the period up to September 8, 1965, and that reasonable attorney's fees and expenses totalled $22,400.67. The total due and owing Jones was therefore $102,766.24, with additional interest of $12.41 per day running from September 8, 1965, until payment.
 
 
 44
 After receiving and digesting the Special Master's report, Jones, on October 21, 1965, moved this Court to consolidate its appeal, filed January 26, 1965, from the December 31, 1964, order in Aid of the Consummation of the Plan, with the other two appeals already consolidated and pending in No. 20936. Jones further moved that we stay filing of briefs and oral argument in the case until the District Court had finally passed on the validity and amount of Jones's claims under the financing agreements especially noting that the District Court's action with regard to Judge Mehrtens' report as Special Master "may prove dispositive in whole or in part" of the appeals. On November 11, this Court granted the motion.
 
 
 45
 In November, 1965, a group of banks, who, as the Bank Group, are appellants here, were currently financing Atlas (and then had more than $2,400,000 in Atlas notes secured by accounts receivable). They became alarmed because Atlas was failing to meet its obligations on the notes, Atlas, in conjunction with the Bank Group, procured from the district court an "Order Authorizing Interim Financing Pending Entry of Final Decree" on November 30, 1965. The order adopted, almost verbatim, the elaborate minutes of the meeting of Atlas at which this arrangement was set out. The order recited in part: "Upon motion of the Continuing and Reorganized Company [Atlas]. * * *, it appearing * * that [Atlas] * * * has been unable to meet and discharge the indebtednesses which it assumed in accordance with the * * * Plan of Reorganization and with [its own] * * * contracts * * *, and it further appearing that the Co-proponent of the Plan [Burden], though he did * * * deposit the sum of $1,003,000.00 for the acquisition of 51% of the new capital stock * * *, the said Co-Proponent * * * did not discharge the other financial commitments required of him under the Plan and that he is in need of additional time." The Court approved the Bank Group's proposed arrangement for such interim financing. The arrangement provided that the Bank Group set up an operating fund of $100,000. Each member of the Group contributed a percentage to this fund corresponding to the percentage owed to that member of Atlas' total outstanding debt to the Group. The operating fund would be used to pay operating expenses of Atlas, and would be replenished by collections of accounts receivable. A committee was elected by the Group to oversee the operation.
 
 
 46
 The order approving this arrangement provided that secured creditors of Atlas who did not wish to participate as members of the Bank Group would have collections which were made by the Group credited to the non-participators' accounts, but a collection fee of 30.51 per cent would be deducted and placed in the operating fund. The operating fund would be distributed pro rata at the winding-up of the interim financing scheme. The district court order did not require the Bank Group to account to the court for its activities.
 
 
 47
 On December 21, 1965, the district court raised the collection fee deducted from remittances to non-participating institutions from 30.51 per cent to 50 per cent.
 
 
 48
 Jones moved to confirm Judge Mehrtens' report as Special Master. District Judge Emett C. Choate, who had heard most facets of the action until then, requested Jones to move that he disqualify himself at this point. Jones obliged, and on December 10, 1965, Judge Choate recused himself from any aspects of the case dealing with Jones, declining to decide whether the Special Master's report was to be confirmed. Judge David W. Dyer, then Chief Judge, assigned this question to Judge (now Chief Judge) Charles B. Fulton.
 
 
 49
 On July 22, 1966, the District Court recited that the plan of reorganization had not been performed, and that certain pending litigation[5] "may require the Trustee in the future to come back and take charge of the operation in the event the Plan is not fully consummated;" and that if that happened, "the records that might be required in such instance should be preserved apart from the records of the reorganization;" the Court then ordered that all of the relevant records be placed in a bonded warehouse in Miami, and that Burden furnish an accounting of all transactions subsequent to July 1, 1965. Finally, the Court ordered that Burden should show cause on August 5, 1966, why the final consummation of the Plan had not been accomplished. The District Court held hearings on August 5, 9, and 12, on this question.
 
 
 50
 On August 17, 1966, the Bank Group[6] entered into an agreement with the General Diversified Funding Corporation of Dallas, Texas (GDFC). Under this agreement GDFC was made agent for collection of the Atlas receivables. GD FC in turn farmed out these accounts to the General Electric Credit Corporation (General Electric), which classified the accounts as current or non-current, and which collected the current accounts. Non-current accounts were remitted to GDFC for collection. The Bank Group was to pay GDFC $20,000 per month. That sum was to be used to pay for (a) the cost of collections, (b) operation of "a nucleus of a company [Atlas],[7] (c) assistance "in the prosecution of the present suit against Beneficial Finance Company" and any other Atlas litigation.
 
 
 51
 Further, if after collection of all collectible accounts a deficiency still existed, then "said deficiency * * * shall be satisfied by one-third * * * of the net proceeds of any judgment or settlement obtained from the Beneficial Finance Company suit. * * *"
 
 
 52
 GDFC was allowed to terminate this agreement at will. The agreement also stated: "If on or before September 1, 1966, * * * [GDFC] and J. Charles Burden, Jr., do not own 80% of the authorized and issued stock of Atlas * *, [GDFC] * * * at its option may terminate its relationship with the [Bank Group] * * * under this contract by giving ten day notice. * * *" Atlas, through Burden, "approved and accepted" this agreement.
 
 
 53
 On August 24, the District Court held that Burden was obligated to deposit $250,000 in escrow for use in consummating the plan. If that sum was not deposited in ten days, the Court held further, Burden was obligated to deposit $75,000 in a demonstration of good faith. Unless the $75,000 was deposited, the District Court held that the Trustee would reassume control of Atlas. Burden, aggrieved by this order, appealed to this Court for an "emergency stay order and equitable relief." Judge Ainsworth granted such a stay on October 20, 1966, to preserve the status quo and to prevent irreparable injury. This appeal by Burden was numbered 24157.
 
 
 54
 On October 14, 1966, Judge Fulton, after lengthy consideration, granted Jones's motion for confirmation of Judge Mehrtens' report as Special Master. The Trustee appealed from this order, and this appeal was referred to as "the unnumbered appeal" until given No. 24449.
 
 
 55
 On October 26, 1966, this Court ordered that No. 24157 be expedited for hearing, and that Judge Ainsworth's temporary stay order of October 20 remain in effect until further order of this Court.
 
 
 56
 On December 20, 1966, this Court granted the motions of certain members of the Bank Group to intervene in No. 24157.
 
 
 57
 On December 30, Jones filed a motion to docket and dismiss the appeal in No. 24449 as untimely. On December 30, Jones filed another motion, this one asking for leave to intervene in 24157.
 
 
 58
 In addition to matters discussed above, the contempt action of United States v. Ray, No. 23891, and the case of Chase Manhattan Bank v. Ray, No. 22852, were also awaiting a hearing in this court. Faced with this collocation of causes and parties, we directed each party concerned to file by January 23 memoranda analyzing all of the cases and their issues and ramifications, with attention to be given to how each case affected the others, and to how the several results possible in each case would affect the outcome of the others. We there stated that in making this out-of-the-ordinary request, we realized "that this case is just getting underway, but as it has such a definite bearing upon the major problem with which the Court is concerned — how to get this old case finally to an end — the parties are to do the best they can in informing the Court. * * *"
 
 
 59
 On January 16, J. Edward Worton, as attorney for the Trustee, petitioned this Court for a modification of our stay in order that the District Court might consider settlement in the New Jersey litigation against Beneficial Finance Company. Beneficial had offered $250,000 and then $375,000 in settlement of the Atlas claims.
 
 
 60
 On January 27, Judge Choate held a hearing on the feasibility of settlement of this litigation. On February 1, Judge Choate entered an order (amended February 3) authorizing the Trustee to settle the case for $375,000.
 
 
 61
 After having read the memoranda submitted in response to our January 13 order, we concluded that a further factual hearing in District Court was required to settle certain issues before a meaningful appeal could be had. Therefore, on February 6, we ordered that Chief Judge Fulton hold such a hearing in which all parties could participate, requesting findings of fact, conclusions of law, and the appropriate orders, with respect to the matters enumerated in our order. We provided in this order that any party aggrieved or dissatisfied with any finding, conclusion, or order of Judge Fulton's could perfect his appeal by a letter to the Clerk of the Court of Appeals. On February 15, Judge Fulton, complying with our order, scheduled hearings to start on February 23, and listed the following issues (which are a substantial paraphrase of those detailed in our order of February 6) as under consideration:
 
 
 62
 "1. When, in what manner and to whom did Burden pay the original sum of $1,003,000?
 
 
 63
 1 A. By whom, to whom, in what amounts and for what purposes was said sum of $1,003,000 disbursed or used?
 
 
 64
 1 B. Was said sum of $1,003,000 misused or misapplied by anyone? If so, how, when, by whom and to what extent?
 
 
 65
 1 C. If there was misuse or misapplication thereof, in what way and to what extent, if at all, did it result in shortage of working capital for the reorganized company, or otherwise impede the consummation of the Plan as amended?
 
 
 66
 2. When, how, to whom, for what purpose and by what specific judicial or corporate authority did Burden directly or indirectly advance, pay or personally guarantee the further additional sum of $1,250,000, or any portion thereof? 2 A. If Burden has advanced, paid or personally guaranteed sums in addition to the original advancement of $1,003,000, by whom, to whom, in what amounts, for what purposes and by what judicial or corporate authority were such additional sums used or disbursed?
 
 
 67
 2 B. If Burden did pay, advance or personally guarantee such additional sums, to what extent, if at all, did the Trustee, the Reorganization Managers or the Pro Tem Directors or Officers of the reorganized company actively participate in the use or disbursement thereof?
 
 
 68
 2 C. If Burden has not fulfilled his commitment, under the Plan to furnish an additional sum of $1,250,000, to what extent is Burden now able and willing to furnish additional working capital?
 
 
 69
 3. What is the present cash position of the reorganized company, taking into account the cash balance, if any, on hand in the so-called Bank Group?
 
 
 70
 3 A. How much money is now reasonably needed to consummate the Plan of Reorganization as amended?
 
 
 71
 3 B. If Burden is unable or unwilling to furnish such further sum as is needed to consummate the Plan, is there now available another source?
 
 
 72
 3 C. Over a period of the last six (6) months what has been the average monthly cash flow of the Reorganized Company?
 
 
 73
 4. Specifically, what did the District Court, the Trustee or any other party do, separately or in concert, to interfere with the management of the reorganized company?
 
 
 74
 4 A. If there was such interference, how and when did it occur, and in what way and to what extent did it hinder the ultimate consummation of the Plan or otherwise detriment the reorganized company, its creditors or the parties?
 
 
 75
 5. What is the present status of the reorganized company with respect to the Plan for Reorganization?
 
 
 76
 5 A. What things remain to be done in order to fully consummate said Plan?
 
 
 77
 5 B. Is there a likelihood that the Plan will be consummated; if so, when?
 
 
 78
 5 C. If it is not reasonable to expect that the Plan can be consummated, what procedures should now be envoked?
 
 
 79
 6. Considering the present posture of this overall controversy, in what way and to what extent is said Stay Order benefiting or detrimenting the reorganized company, its creditors or the parties?
 
 
 80
 6 A. Subsequent to October 14, 1966, did any Judge of this Court state to any party or counsel that the Stay Order of Judge Ainsworth, subsequently continued by this Court, eliminated the necessity for the filing of a Notice of Appeal, or that said Stay Order did prohibit the filing of a Notice of Appeal in No. 24449 (formerly captioned Unnumbered Appeal — Appeal from Judge Fulton's Order of October 14, 1966)?
 
 
 81
 Co-proponent Burden shall be present at the hearing. In addition to the material which he filed with the Clerk of this Court on February 14, 1967, he shall produce for inspection at the hearing all other material in his possession, custody or control which is relevant to the issues of this overall controversy."
 
 
 82
 On February 17, Burden moved this Court for a stay of Judge Choate's order allowing settlement of the Beneficial litigation. We thought that the question of advisability of settlement was so intertwined with the unanswered questions set for determination by Judge Fulton that, on February 21, we denied a stay of Judge Choate's order allowing settlement, and referred the question to Judge Fulton to be considered along with the other matters referred to him. Judge Choate's hearing on the feasibility of settlement had been a public hearing, and a representative of Beneficial was present in the courtroom. We felt that further hearings on the advisability of settlement should be confidential, so that Beneficial could not be present to learn what course Atlas would take in that suit. Therefore we authorized Judge Fulton to hold his hearings on this question in camera. In this order, we stated also, summarizing what had already taken place in pieces: "In the exercise of this Court's supervisory power and to assure an expeditious winding up of this protracted litigation, the entire proceeding is hereby committed to the direction and control of Chief Judge Fulton."
 
 
 83
 On March 7, we enlarged upon and enlarged Judge Fulton's powers even more by amending our February 6 and 21 orders. We explained that Judge Fulton's power to enter "appropriate orders" meant power to enter "both final order or orders as well as all interim orders which Judge Fulton may find it necessary and expedient to enter to conserve and protect the assets of the Trustee and the continuing reorganized company through appointment of a receiver, by injunction, or otherwise." We further provided that any order entered by Judge Fulton had the automatic effect of modifying our stay to the extent of its own terms and that the parties aggrieved by such orders might petition this Court for further stays.
 
 
 84
 In a per curiam opinion dated June 5, 1967, we finally disposed of No. 22852 (Chase Manhattan Bank v. Irwin Ray); everything in No. 20936 except the appeal from the Order of September 18, 1963; and No. 24449 (Irwin Ray v. Jones).
 
 JUDGE FULTON'S FINDINGS AND CONCLUSIONS
 
 85
 Pursuant to our directions, Judge Fulton held an extended hearing in this case from February 23 to March 9, 1967. The transcript of the proceedings is more than 3,000 pages long and there are numerous and voluminous documentary exhibits. The court made 103 separate Findings of Fact which are grouped under eight main topics (A-H) and fifteen Conclusions and Recommendations.
 
 
 86
 In reviewing the present status of Atlas, the district judge found that upon the evidence present adjudication in bankruptcy was the only alternative remaining. (However, he has issued a notice to all parties that a further hearing will be held before him on July 13, 1967, at which time the court will consider whether an order should be issued dismissing the Chapter X proceeding or adjudicating the company a bankrupt.) He said that with slight exception Atlas's creditors and stockholders have not received the cash and securities to which they were entitled under the plan, and that nearly $3,000,000 would be required to consummate the plan and pay the company's obligations. He found that Atlas has virtually no assets other than the claim against Beneficial, its rapidly dwindling accounts receivable and bank accounts totaling $16,500; that since May or June 1966, all of its outlets have been closed, it has made no sales of any kind and has engaged in no activity other than the collection of a few of its accounts. He found that "Bank Group No. 1," a group of lending institutions, had received court authority to collect pledged accounts receivable, and from this group another emerged known as "Bank Group No. 2" which, with General Diversified Funding Corporation and the participation of Mr. Burden (and without the knowledge and consent of the court), took possession and assumed control over all of Atlas's assets and affairs. He said that the company should be described as a corporate corpse beyond any possibility of resuscitation and that the function of the findings is "in the nature of an autopsy, seeking to determine when the death occurred, and what were its causes."
 
 
 87
 As we have noted, the Findings of Fact were specific and we summarize them under the same main categories as were used by the district judge.
 
 
 88
 A. Findings as to the $1,003,000.
 
 
 89
 The court found that Burden paid $1,003,000 by depositing various sums from time to time into various Atlas bank accounts; that as to payments by him of $100,000 in August and $400,000 in November 1964, in the absence of a satisfactory accounting from the Trustee, the court could not ascertain the use which the Trustee made of these funds. The sum of $502,500 was paid into the registry of the court where it is being held pending the outcome of litigation between the Trustee and Jones Financial Corporation. The court held that there was no contention and no evidence that the Trustee embezzled or converted any of these funds to his own use and that Burden had not proved the Trustee had misused or misapplied any portion thereof.
 
 
 90
 B. Findings as to the $1,250,000.
 
 
 91
 The court found that under the plan Burden was required to advance as working capital an additional $1,250,000 when needed. On December 19, 1964, Burden was elected chairman of the Board of Directors and president and treasurer of Atlas, with authority to negotiate and consummate loans on behalf of the company. In January and February 1965, Burden and a relative Singletary borrowed $300,000 from a Louisiana bank which was deposited to Atlas's credit, and Atlas accounts receivable with a face value of $432,000 were pledged as security to Woodstock, the family partnership composed of Burden and Singletary. Additional loans from other lending institutions were made by Burden secured by pledges of Atlas accounts receivable and most, if not all of these loans, were guaranteed by Burden's personal endorsement (Burden contends his personal endorsement for the company is on loans totaling $1,962,694.10), plus personally guaranteed trade accounts in the amount of $271,109.26. The court said it was impossible to determine accurately how much money Burden borrowed for the company upon notes which he endorsed and that he had not approved the guarantee by him of the trade accounts. However, loans made by various lending institutions to Atlas with Burden's personal endorsement exceed the sum of $1,250,000. In sum, the court found that though Burden had personally guaranteed such loans, he had not complied with the requirements of the plan or met his commitment to lend the company $1,250,000 and that he was not willing or able to do so now.
 
 
 92
 C. Findings as to Present Financial Status of Prospects.
 
 
 93
 The court found in miscellaneous small bank accounts that there is a total of $16,428.63 to Atlas's credit. The sum of $638,878.91 has been paid or set aside toward consummation of the plan to pay fees and expenses of $136,378.91; Jones Financial, $391,916.54; Jones Financial deposit in registry pending disposition of Jones's claim, $110,583.46; and Irving Trust Company for senior creditors' group, $100,000. Additionally there is due the sum of $174,681.93 for certain obligations such as wages, federal and state taxes, unsecured claims of $100 or less and priority claims of landlord.
 
 
 94
 Banco Popular de Puerto Rico has a secured claim based on a judgment in the sum of $112,118.35. Burden is unable and unwilling to provide further funds and there is no evidence that anyone else will do so. There are other claims such as that of the United States for taxes of $175,408.71, various banks of $1,990,569.09 secured by pledge of Atlas's receivables and the collection of accounts receivable continues to dwindle totaling only $29,610.67 in January 1967. The court found that Atlas's liabilities exceed its assets by several million dollars.
 
 
 95
 D. Findings as to Interference with Atlas's Affairs.
 
 
 96
 No party to the proceedings claimed that any judge of the district court did anything to interfere with the management of the reorganized company and the court so found from its own independent evaluation of the evidence. The court found that Burden was guilty of acts or omission which interfered with Atlas's affairs in numerous particulars such as being late in paying in the original $1,300,000, in not paying in the additional $1,250,000 required by the plan, in not furnishing the reorganized company the promised management personnel, in pledging Atlas's furniture and fixtures to secure payment of a note for $14,000, in stopping payment of checks drawn and forwarded to the Director of Internal Revenue for the payment of taxes, in pledging accounts receivable of the company to obtain personal loans, in pledging shares of stock of the company before the stock was lawfully issued to him, in failing to make a proper accounting of his management of the affairs of the company though ordered by the court to do so. The judge found that Mrs. Blackburn, assistant secretary of the company, had admittedly falsified books and records, had admittedly concealed and hid books and records to deceive the auditors and had accepted the $14,000 note and mortgage previously described in the preceding finding.
 
 
 97
 The court said the Trustee was guilty also in that he knew about and instructed Mrs. Blackburn to falsify books and records and to conceal and hide them; that he improperly withdrew funds from special escrow accounts of the company, filed misleading financial reports with the court, was arrogant and arbitrary in the manner in which he conducted the company's operations.
 
 
 98
 The court found that the charges that Wolff interfered with the management were not borne out by the record.
 
 
 99
 It found that "Bank Group No. 1" was formed to collect Atlas's receivables pledged to member banks and that without authority it took complete charge of Atlas and proceeded to liquidate it. In the meanwhile, one Mergner and GDFC then conducted a private sales program for a period of months until abandonment, all without the knowledge and consent of Burden, never having been disclosed to the court and no accounting was ever made to the company or court by Mergner, GDFC, Rutig or "Bank Group No. 1." The court pointed out numerous transactions between the members of "Bank Group No. 2" and Mergner and GDFC whereby there was assignment of Atlas's pledged accounts receivable to GDFC for collection, thence to General Electric Credit Corporation without any accounting to Atlas. The court found that the misconduct referred to should not pass unnoticed and unrectified and each of the wrongdoers should be surcharged at the appropriate time.
 
 
 100
 E. Findings as to Consummation of Plan.
 
 
 101
 The court found that Atlas's total assets cannot be definitely ascertained at the present time, though it has bank accounts totaling $16,500 and outstanding accounts receivable with a net value of some $500,000; also, if the Beneficial litigation is settled, an additional $375,000 will be realized so that the combined assets will total less than a million dollars, whereas liabilities are two or three times as great. There is no likelihood that the plan of reorganization will be consummated and since the company no longer has any business activity or prospects for additional moneys, adjudication seems inevitable.
 
 
 102
 F. Findings as to Continuation of Stay Orders.
 
 
 103
 The court held that continuation of the stays would not benefit the reorganized company or any of the parties and that the stay order should be dissolved.
 
 
 104
 G. Findings Regarding Notice of Appeal in No. 24449.
 
 
 105
 The court found that there was no evidence that any judge of the district court made any statement of any kind to any person concerning the necessity for filing a notice of appeal in the above matter. (Docket 24449 has been disposed of by this court by its per curiam dated June 5, 1967 which affirmed Judge Fulton's confirmation of the report of the Special Master. Therefore, further consideration of matters pertaining to this docket number is unnecessary since the case is now moot.)
 
 
 106
 H. Findings as to Beneficial Settlement.
 
 
 107
 The court found, after an in camera hearing, that the offer to settle the Beneficial claim for $375,000 should be promptly accepted and that although there has been an appeal in the court's order authorizing settlement, the order has not been superseded and, therefore, there is no impediment to the settlement of the litigation.
 
 
 108
 The court handed down its Conclusions and Recommendations agreeably to the preceding findings and also recommended that Burden be removed as officer and director of the company; that the Trustee be relieved of his duties; and that a Receiver be immediately appointed to protect Atlas's assets. Accordingly, the district judge removed Burden and the Trustee, Irwin Ray, and appointed Horace F. Cordes, Receiver, and placed the Receiver in charge of the assets of the reorganized company with full authority to collect the outstanding debts due it but without authority to disburse funds without prior authorization of the court. The Trustee and Burden and all other parties were ordered to deliver possession and control of the assets, books, papers and records of Atlas to the Receiver and the Receiver was authorized to proceed to complete the compromise of the pending litigation with Beneficial Finance Company.
 
 
 109
 The Bank Group and Burden have appealed Judge Fulton's order.
 
 APPEAL OF BANK GROUP
 
 110
 The Bank Group raises three principal points of error, as follows:
 
 
 111
 1. The district judge erred in ordering sequestration of the bank accounts of and accounts receivable pledged to the Bank Group and directing the newly appointed Receiver to take over.
 
 
 112
 2. The district judge erred in determining the Bank Group to be guilty of legal misconduct.
 
 
 113
 3. The district judge erred in authorizing the Receiver to compromise the Beneficial Finance Company litigation.[8]
 
 APPEAL OF BURDEN
 
 114
 Burden specifies numerous errors; in fact, he has taken specific exception to 45 of the trial judge's 103 Findings of Fact. However, the principal points which he has raised are as follows:
 
 
 115
 1. The district judge erred in failing to consider the points previously raised before Judge Choate in connection with Judge Choate's order of August 24, 1966, where he found that a further contribution of $250,000 by Burden could consummate the plan and ordered Burden within ten days to pay $75,000 into the registry of the court under penalty of turning the company back to the same Trustee who heretofore had charge of the company.
 
 
 116
 2. The district judge erred in not recusing himself because he had strong feelings and preconceived conclusions about the case.
 
 
 117
 3. The district judge erred in conducting his inquiry about the conduct of Burden and the Bank Group after the order of substantial consummation of July 1, 1965, when the Trustee turned over to Burden "a practically hopeless situation," rather than to inquire into the reason why the company had not been turned over to Burden in January 1965.
 
 
 118
 4. The district judge erred in not laying "a sufficiently broad predicate" during the trial to inquire into the company's situation before Burden's advent on the scene and into circumstances surrounding the Beneficial litigation.
 
 
 119
 5. The district judge erred in ordering sequestration of the bank accounts of and accounts receivable pledged to the Bank Group and directing the newly appointed Receiver to take over. (This is the same as assigned error No. 1 of the Bank Group.)[9]
 
 
 120
 The argument[10] of these appeals from the Order of Judge Fulton and the two earlier ones of Judge Choate requiring (a) posting of an additional $250,000 in working capital or suffer adjudication and (b) ordering the settlement of the Beneficial case has served to reduce the issues for our discussion and determination. Some pertain to Burden only, others to the Bank Group. As to many the attack of each, if not the supporting theory, is parallel. At the outset it bears emphasis to point out some things Judge Fulton did not do. He has not yet surcharged any party. He did find that facts revealed at these hearings indicate that proceedings on a proper charge and opportunity for hearings are warranted. He did not hold that the assignment of accounts receivable to the members of the Bank Group is invalid or that the Banks are not entitled to collections thereunder. He did not hold that the Receiver, for the use of the Estate or other creditors, is entitled to the benefit and use of such receivables and the collections under them. He held a Receiver was essential for conservation until the rights of all can adequately be determined. He did not determine when or to whom any sequestered properties were or are to be distributed by the Receiver. He did not adjudicate the Debtor. He merely found that the facts of nonperformance of the Plan reveal a basis for the show cause order and hearing scheduled for July 13, 1967 to determine whether on the present record and such further evidence as might then be offered, the proceedings should be dismissed or the Debtor adjudicated a bankrupt.
 
 I.
 THE BENEFICIAL SETTLEMENT
 
 121
 Upon the recommendation of the New York-New Jersey counsel acting for the Trustee and the Company, then counsel for the Trustee Ray sought approval of the proffered settlement of the suit against Beneficial for malfeasance in the collection of millions of dollars of customer contract-accounts receivable. Judge Choate after a hearing held that it was fair and reasonable, and he therefore ordered the Trustee and the Company to settle the case for $375,000. Burden's motion to stay this order aroused some concern whether the public hearing with the representative of the alleged tortfeasor as a more than ordinarily interested observer might have hampered a full exploration of the strengths, the weaknesses, the values and dangers of the lawsuit, and accordingly we ordered Judge Fulton in the hearings then scheduled to re-examine this fully, expressly providing for in camera hearings if thought wise. These were held. Every party (and counsel) other than Beneficial was afforded an opportunity to appear and participate. No one who sought permission to appear was denied the right. Those in actual attendance included Burden, his counsel, Rutig for the Bank Group, Mergner for GDFC, counsel representing the Bank Group, the Trustee, the SEC, counsel representing unsecured creditors, Irwin Ray, Trustee, Irving J. Wolff, and Sam Daniels, amicus curiae. Both Rutig and Mergner testified. All were subject to such cross-examination as was desired, and the Court invited the production of testimony. No one was cut off.
 
 
 122
 Although protesting that the settlement amount is inadequate, neither Burden nor the Bank Group desires that if settlement is to be ordered, the chances for its consummation be imperiled by any detailed discussion in this opinion. It is sufficient to say that their principal thrust, both here and in the in camera sessions, was that the value of the lawsuit should be re-examined by new counsel.
 
 
 123
 A Court need not lecture counsel on the perils and pitfalls of a settlement or the delicate nature of it both in evaluation and in effectuation. We do not minimize the seriousness of this problem or the heavy responsibility which inexorably rests upon the shoulders of the District Judge and now this Court. One of the great unknown factors is, of course, the extent to which the adversary might go in increasing settlement demands or, perhaps more disastrously, determine to withdraw all settlement overtures. Under these circumstances we think the record fully supports the exercise of that delicate judgment in the light of appropriate factors, Florida Trailer & Equipment Co. v. Deal, 5 Cir., 1960, 284 F.2d 567, 94 A.L.R.2d 638.
 
 
 124
 We therefore affirm the order of Judge Fulton and in effect affirm the earlier order of Judge Choate. We have heretofore denied stays so this order to settle is fully effective.
 
 II.
 DISQUALIFICATION OF JUDGE FULTON
 
 125
 Burden alone complains that we should not have sent this case back for the extraordinary hearing before Chief Judge Fulton, and that Judge Fulton should have recused himself. A part of this complaint is that Judge Fulton misunderstood the contentions earlier made by Burden in his petition for extraordinary relief first made to the District Court and then presented to Judge Ainsworth, upon which he entered the stay of October 20, 1966.
 
 
 126
 Burden insists that he did not in these documents suggest that his management and operation of the Company was imperiled and interfered with by any actions of the District Judge. Rather, he insists, all he was contending was that between Trustee Ray and counsel, Irving Wolff, he had no opportunity to run the Company once he took over either during the period January 1, 1965 to June 30, 1965, or from July 1, 1965 on to the present. But he now says Judge Fulton erroneously interpreted his contentions to charge that the judge or judges of the Court were involved and that his natural desire to see the image of the Court fully protected led him to a generally hostile attitude toward the claim of interference by Ray and Wolff. This became aggravated because Judge Fulton had since become Chief Judge and it was his entire Court for whom he now had a concern. This leads him to contend that this Court should have appointed a judge from outside the Southern District of Florida since Judge Fulton, so closely aligned with the position of the Court he thought under attack, could not give it that impartial treatment characteristic of judicial proceedings.
 
 
 127
 We find these attacks completely without merit. In the first place, we read Burden's petition for extraordinary relief which induced the stays of Judge Ainsworth and the confirmation of that by the Court to charge that the reorganization judge allowed himself to be overborne by the Trustee and attorney Wolff and that at least to this extent the Court itself was responsible for the admittedly poor management of the reorganized Company. It was not thought, nor is it now thought, that corruption was charged; but, however nicely phrased, both the papers and the arguments now made before us at this hearing reveal Burden's deep-seated conviction that it was the action or non-action of the reorganization judge that brought about the business failure. Even more pointed, this Court itself put that interpretation upon these papers and we defined the issue categorically.[11]
 
 
 128
 Chief Judge Fulton was entirely fit to hear this proceeding. The record bears out his careful, patient consideration of the case.
 
 
 129
 We therefore affirm Judge Fulton's order as to these charges.
 
 III.
 
 130
 INTERFERENCE BY TRUSTEE AND ATTORNEY WOLFF WITH BURDEN'S OPERATION
 
 
 131
 Apparently as an excuse for admitted nonperformance of the Plan of Reorganization Burden now insists that his inability to perform is due to the actions of Trustee Ray and Burden's counsel Wolff. As we understand these charges, he claims this began in early January 1965, notwithstanding the entry of the order of January 22, 1965, transferring operations to the reorganized and continuing Company. To an extent at least the evidence on the hearings below tended to bear out the fact of actual operations of an intensive nature by the Trustee. For during this period the Trustee wrote not less than 5,000 checks apparently in satisfaction of indebtedness or other obligations of the Debtor or the reorganized Company. But Burden's contention does not stop with June 30, 1965. He insists the interference continued even after July 1, 1965, at which time Judge Dyer, then Chief Judge, entered the order of substantial consummation. From that time forward there was no question but that the full operational responsibility was lodged in the Company, its officers aand board of directors. Presumably this was within the control of Burden since under the Plan he was to receive 51% of the voting stock.
 
 
 132
 Judge Fulton, after a full exploration of these charges and after listening to testimony of Mr. Burden which went on during many days of the prolonged hearing, rejected these charges. After penetrating questioning on argument we were never able to satisfy ourselves how this state of affairs could have come about or why Burden, claiming now to have been conscious of all that was going on, did nothing, certainly nothing so far as the District Court was concerned. For he now candidly acknowledges that the first complaint ever made to the Court about this state of affairs was in his answer to the show cause order issued by Judge Choate on August 24, 1966. Judge Fulton was therefore warranted in finding that this did not constitute a valid excuse for nonperformance of the Plan. Such finding is certainly not clearly erroneous. Fed.R.Civ.P. 52. We emphasize the element of an excuse for nonperformance because we do not wish to affect in any way the litigation which Burden apparently has against the former Trustee Ray or his former counsel Wolff. We can fully understand the difficult predicament, if, as he now asserts, his own counsel was in collaboration with others to bring about a detriment to him. We make no finding against attorney Wolff, but on the other hand the affirmance of this part of Judge Fulton's order is not to be considered in any sense an exoneration of counsel Wolff. That is for another day, another time, and presumably another case.
 
 IV.
 BURDEN'S OBLIGATION FOR WORKING CAPITAL
 
 133
 Although this is related to the basic question of the power of the Court, later discussed (see Part V), Burden alone asserts[12] that Judge Fulton was in error in finding that he had not fulfilled the obligation of the Plan to supply up to an additional $1,250,000 for working capital as needed.
 
 
 134
 This is basically a question of the interpretation of the meaning of that provision in the setting of the whole Plan.[13] Burden contends that this obligation was satisfied by his furnishing additional funds from lending banks under promissory notes of the Company to which he added his personal endorsement. Judge Fulton presumably credited the testimony that these notes bearing Burden's personal endorsement aggregated approximately $1,900,000. If personal endorsements on promissory notes made by the Company would in every instance satisfy the conditional requirement "to advance to the Continuing and Reorganized Company" needed "additional working capital," then Burden has, we may assume, fully complied with that provision of the Plan.
 
 
 135
 But there are several reasons why we agree with Judge Fulton's conclusion that under these circumstances these personal endorsements did not satisfy this contingent but very important obligation. The first, and perhaps the foremost certainly from an economic standpoint, is that these notes were secured by the assignment of the Company's customer accounts receivable. As the initial petition for reorganization and the Plan as accepted reveal, many of the difficulties of the Company were directly attributable to the absence of capital which was not immobilized under pledges of accounts receivable. Under these arrangements, the Company's position was not effectually bettered, and certainly not so in the light of the history revealed by this record of substantial defaults by customers which called for a continuous rotating substitution of new and better collateral. There is no evidence that any of these sums — certainly not up to $1,250,000 — would have been advanced on the Company's and Burden's signature alone, unaccompanied by the pledge of receivables. The infusion of additional working capital is not effectuated by fettering the Company's existing quick assets.
 
 
 136
 Just as significant, however, is the construction put on that Plan by Burden, the Company, and, for that matter, the Bank Group. As we discuss later in Part VIII, Burden as the president of the Company filed a petition before the reorganization Judge which resulted in entry of the order of November 30, 1965, setting up the operation of the Bank Group and the collection of the accounts receivable previously pledged and to be pledged to member banks. This petition and the resulting order incorporated by reference detailed minutes of the Board of Directors of the Company. The Company as an entity, through Burden, its President, and the Board of Directors, expressly authorized the filing of the petition to obtain the desired order. The order prepared by the Company counsel, consistent with these resolutions and the petition, contained strong representations by them, and Judge Choate entered an order accordingly. After referring to the bank financing arrangements made by the Debtor before the Plan and the reorganized Company after the Plan, the order recited that "the Company has been unable to meet and discharge the indebtedness which it assumed in accordance with the terms and conditions of the Plan of Reorganization * * *." More important, it went on to recite that while Burden, the co-proponent, had paid in the sum of $1,003,000 for acquisition of 51% of the stock, Burden, "the said co-proponent of the plan did not discharge the other financial commitments required of him under the plan * * *."
 
 
 137
 Whatever construction the Bank Group may be entitled to put on that language, we think that so far as Burden and the Company was concerned, this was a positive affirmation to the reorganization Judge of two things. The first was that Burden recognized that there was still an obligation to supply working capital up to $1,250,000. And, second, that he had not met this obligation and it remains substantially unfulfilled.
 
 
 138
 The result is that we agree with Judge Fulton's interpretation of the provision of the Plan. We affirm also his Findings that, as thus interpreted, Burden has not complied with this obligation. In view of the intervening developments and all of the facts uncovered at the hearing and the findings made by Judge Fulton as approved by us and the impending show cause hearing of July 13, 1967, we find that portion of Judge Choate's order fixing the dollar amount at $250,000 to be superseded and effectually moot.
 
 V.
 
 139
 POWER OF REORGANIZATION COURT AFTER ORDER OF SUBSTANTIAL CONSUMMATION
 
 
 140
 Both Burden and the Bank Group[14] contend that after the entry by Judge Dyer of the Order of Substantial Consummation July 1, 1965 (see Footnote 4 and related text) the Bankruptcy Court had no power to enter orders of the kind made by Judge Choate on August 24, 1966 or those now entered by Judge Fulton, including particularly the appointment of the Receiver, the sequestration of assets, the administration under the supervision of the Court, and the like.
 
 
 141
 Burden's position is much more extreme than that of the Bank Group. On argument counsel for the Bank Group with candor acknowledged that the mere entry of an order of substantial consummation does not deprive the Court of the power — that is jurisdiction — to enter appropriate orders to see to it that the Plan is carried out or, failing its effectuation, suitable protective arrangements are made for those adversely affected. Burden on the other hand, urges that by operation of Section 229 of the Bankruptcy Act (11 U.S.C.A. § 629) and Section 224 of the Act (11 U.S.C.A. § 624), the Court lost all power to enter any sort of orders after the Order of Substantial Consummation. Pressed on argument Burden was unable to give any satisfactory reasons why the reorganization court would be powerless to do anything even though, after the entry of an order of substantial consummation, the facts showed a substantial noncompliance and nonperformance of the Plan.
 
 
 142
 The question is a serious one and one on which we should make a clear decision, since so much in the future depends upon the reorganization court's power to act long after the consummation order. The substantive position is expressed by almost identical language in the briefs of Burden and the Bank Group. Both assert that Chapter X for corporate reorganization provides nothing more or less than compromises by a debtor with its creditors. Stripped of technical ramifications and legal dressings, both proceedings contemplate that a debtor, unable to meet its debts as they mature, invokes the aid of a Federal Court, with its injunctive powers, and proposes a plan to compromise its obligations with its creditors. This plan is examined by the Court, and if it is approved, it is voted on by the creditors, and if accepted, by the requisite majority, the bargain is sealed, and the stamp of approval is put on the Plan by the entry of an Order of Confirmation. Once the Order of Confirmation is entered, the contract has been made and approved and the debtor's obligation is to go forth and carry out its new undertakings under a compromise agreement.
 
 
 143
 The argument rests on those expressions found in accepted authorities in bankruptcy[15] in which the power of the Reorganization Court is a limitation upon the right of that Court to reserve power either to alter the Plan or to superintend the day-to-day operations of the business by the Reorganized Company.
 
 
 144
 Great stress is laid upon Section 229 of the Act (11 U.S.C.A. § 629)[16] especially in the light of the legislative history.[17]
 
 
 145
 There are a number of reasons, however, which lead us readily to support Judge Fulton's finding that the Reorganization Court did have the power to enter the orders under attack. Not the least of these is the order of substantial consummation itself. While the caption does describe it as an "order of substantial consummation" the body of the order reveals plainly that it is stated in terms of things to be done in the future, upon the happening of which the Plan will have been consummated substantially. Thus, in the preamble to the decretal portion, the Court after briefly describing the actions theretofore taken declares "that the performance of other acts is necessary for the substantial consummation of the said Plan of Reorganization * * and that the Continuing and Reorganized Company is ready and able to discharge the said acts to substantially consummate the said Plan." Continuing, in the decretal portion paragraph 10 recites that as to "creditors in Classes 3, 4 and 5 said claims shall be paid within the time allowed * * *," the Company "shall issue 420,000 shares of its fully paid * * *" stock to creditors of Class 12 and "creditors classified as Class 1 creditors * * * shall be paid * * *." Even more positive is the condition in paragraph 7 (see note 4, supra and related text) of the order of substantial consummation, under which the assignment previously executed on January 22, 1965, is made "effective * * * when the payments hereinabove set out to be made in cash are actually paid" by the Company. And to all of this must be added the unusual requirement of the Plan for the addition of $1,250,000 in added working capital as and when needed at some unknown, indefinable time. With the operations under the Plan just getting underway — at the earliest January 22, 1965, and on Burden's theory July 1, 1965 — it was impossible for the Judge to have declared on July 1 that this substantial provision of the Plan would not call for action in the future. And there is certainly nothing in the order which could lead anyone to infer that the Reorganization Judge by that order was ruling out the likelihood that added working capital would be needed and would have to be supplied to "substantially" consummate the Plan.
 
 
 146
 It rounds out this factual aspect of the question to state briefly that it is uncontradicted that in many material respects the Plan has not been consummated and, worse, there seems to be little likelihood that it ever can be fulfilled. For one reason or another, none of which appears to have been passed upon by the Reorganization Court, the Company has never issued to the Class 12 creditors the 42% common stock. Next, there are not less that $175,000 in claims payable in cash under the Plan as to which there has been no payment. In addition there are still some $1,990,000 in amounts due to the members of the Bank Group (and others) holding pledges of the accounts receivable.
 
 
 147
 On the other side of the picture all that has happened is that Burden paid in the $1,003,000 and issued the 51% of the stock to himself. The Trustee or the Company, or both, paid off the August 1962 Jones claim, deposited a sum in the registry to cover the December 1961 Jones claim plus the payment of certain fees and expenses to counsel, Trustee and to the Irving Trust Group.
 
 
 148
 And in the light of this factual record there is nothing in these cases (note 15, supra), or the 1952 Amendments, or the legislative history, to deprive the Reorganization Court of the power to come in and take protective action. This is in no sense an amendment of the Plan. The Court has been called upon to act because the Plan, confirmed and approved and adopted by all, has simply not been satisfied and at the present time there is every indication that it cannot be met. Nor is it an effort by the District Court to insert itself into the day-to-day managerial decisions of a going business. The Court is not attempting to exercise jurisdiction for the purpose of passing upon normal business activities of a rehabilitated corporation or upon other matters not related to the Plan of Reorganization. It would be shocking if merely because of the entry of an order which by name and content was an order of substantial consummation, the Court would find itself powerless to take protective action in the face of admitted substantial nonfulfillment and, worse, a demonstrated probability that the Plan can never be consummated.[18]
 
 
 149
 We therefore affirm Judge Fulton's order insofar as the Reorganization Court took over the immediate direction and supervision of the business and its affairs through the appointment of the Receiver and the other protective orders.[19]
 
 VI.
 APPOINTMENT OF RECEIVER
 
 150
 Since, as we have held, the Reorganization Court had the power notwithstanding the July 1, 1965, Order of Substantial Consummation to take protective steps, the question remains whether over the objection of Burden and perhaps the Bank Group the appointment of the Receiver and the orders respecting control and disposition of corporate property were equitably permissible applications of that power. Related somewhat to that is the appropriateness of the issuance of the July 13, 1967, show cause order on adjudication or dismissal.
 
 
 151
 At the outset Burden is in a poor position to challenge this. Though belatedly made in a formal way for the first time in August 1966, he asserts, as we have indicated previously, that he has felt from early 1965 that he and his Company were the victim of machinations of the Trustee Ray and Company counsel Wolff. The more he dramatizes these deeply felt grievances, the more convincing it becomes that for the protection of all concerned, it was essential that the Court step in. Although called on pursuant to this Court's order of February 21, 1967 to produce substantiating evidence in support of the charges asserted and which precipitated our orders of February 6 and 21, 1967, Burden for all practical purposes was unable to do so. Similarly during the course of the hearings when Judge Fulton probed carefully and painstakingly for an accounting from Trustee Ray, from the Bank Group, from GDFC, from Burden, and from the Company, he could get only the most unsatisfactory picture. We may grant readily that this inability was due in large part to the omnibus character of this remanded hearing, the rather broad issues which were subject to expansion as facts were further revealed, that these parties were in a difficult position to make an account. Indeed, Judge Fulton recognized this by formally requiring reports to be filed within 45 days.[20]
 
 
 152
 The simple fact is that no one knew what shape the affairs of this Company were or how or where it stood with substantial accuracy respecting the claims of creditors both pre-petition as contained in the Plan and post-petition administrative expenses.[21] There were practically no visible, findable assets. Bank balances were small in amount and subject to a number of undisclosed escrow priority claims. There was more than enough for the Court to conclude that vigorous effective action had to be taken for the conservation of what little remains of a company which for all practical purposes is out of business except for having its bankers collect accounts receivable.
 
 
 153
 And this being a Chapter X proceeding which covers indebtedness of all kinds, secured and unsecured, it is entirely within the power of the Reorganization Court to take effective control over the property of the Debtor that has been pledged or mortgaged.[22]
 
 
 154
 The appointment of a Receiver with the definitive powers granted to him was proper and is affirmed.[23]
 
 VII.
 SHOW CAUSE ORDER TO ADJUDICATE
 
 155
 Behind this Court's orders of February 6 and 21, 1967 (and the later order of March 7, 1967), was a concern that things were rapidly going from bad to worse, if indeed they could be worse, and that the minimum demands of an orderly administration of justice called for an early determination on an effective and adequate record of just where the reorganization proceedings stood. The Plan had not been consummated. The indications were that it could not be. All of these things had a bearing upon the two orders that precipitated these post-remand hearings: (1) the order requiring the deposit of additional $250,000 working capital, and (2) approving the Beneficial settlement. In a larger sense it bore upon whether a court of equity any longer could lend its name to an enterprise that had and was failing its court-contracted obligations. We therefore directed Judge Fulton to ascertain these facts. This he undertook to do in response to specific issues which fairly paraphrased the points delineated in our orders.[24]
 
 
 156
 One can hardly question — and certainly not Burden — Judge Fulton's graphic conclusions. In the course of his report Judge Fulton stated:
 
 
 157
 "During the trial, Mr. Burden repeatedly testified that Atlas is and since July 1, 1965 has been nothing more than a `bag of bones.' During the course of the trial one of the participating lawyers spoke of the company as a `can of worms.' This Court feels that the company can be more aptly described as a corporate corpse, which has long since been beyond any possibility of any resuscitation. Hence the major further function of these findings is in the nature of an autopsy, seeking to determine when the death occurred, and what were its causes."[25]
 
 
 158
 With the most favorable recoveries the Court estimated that at most the combined assets would not exceed $1,000,000 against liabilities of two or three times that much. This led him to conclude "There is no likelihood that the plan will be consummated. Neither Burden nor anyone else has offered to provide the moneys now needed to consummate the plan. Burden himself testified that under present circumstances he would not put another nickel in the company."[26]
 
 This led the Court to conclude:
 
 159
 "Since the company no longer has any business activities or any prospects for the infusion of additional moneys, and its liabilities far exceed its assets, adjudication seems inevitable."
 
 
 160
 Nonetheless, the Court did not take precipitate action. Rather, with an ample basis for these tentative conclusions, it issued its show cause order with wide publication in New York and Florida with notice sent to some 5,000 creditors.[27]
 
 
 161
 The Bank Group as well as Burden earnestly entreats the Court to order Judge Fulton to postpone this hearing. This request is made again, as it has often been in the past, with no indication of the identity, financial responsibility, terms or conditions upon which new capital would come into the enterprise. In the face of this record we decline to do so. Whether Judge Fulton after the commencement of that hearing determines that it might be in the interest of orderly administration to delay its further progress or conclusion is a matter left to his sound discretion.[28]
 
 
 162
 We will state again formally, as we have from the bench every time these cases have come up, that this Court would welcome and would take whatever steps the parties or the District Court thought appropriate by the infusion of new capital or new interests or otherwise which would enable the Plan to be carried out. But if — and the if is a real if with no possible suggestion of a prejudgment on our part — the further hearings held pursuant to the Show Cause Order on the present record plus that amplified in those hearings demonstrate an inability substantially to comply with the Plan, then consistent with the requirements with Chapter X and controlling legal principles the case must be brought to some kind of end.
 
 VIII.
 
 163
 VALIDITY OF ACCOUNTS RECEIVABLE PLEDGES AND RECEIVER'S SEQUESTRATION
 
 
 164
 As we pointed out in the beginning, Judge Fulton has not declared the pledges to the member banks of the Bank Group (or to the other pledges) invalid. He has held that the Bank Group No. 1 or Bank Group No. 2 and certainly GDFC took actions while pledgees of the collateral that were not authorized by court order and which under the circumstances amounted to probable legal wrongs for which they were subject to being surcharged. But the two things may be completely distinct. It is entirely possible that a pledgee with wide powers in the enforcement of collateral to effectuate its secured position is entitled to hold the collateral and use of the proceeds of it but, at the same time, be chargeable for consequential damages if illegal actions are taken.[29]
 
 
 165
 Since this Court has been impelled by this feeling that orderly administration calls for some decisive resolution of this prolonged but dying enterprise, we think it consistent with that approach for us to indicate our views even though there is some question whether the validity vel non is directly before us. Although we would leave to further proceedings, if any, in the District Court, to determine the status of any particular assignment of the accounts receivable or the resolution of any attack not heretofore made on their validity, we cannot on the present record find any basis for questioning the validity of these assignments. We emphasize again the distinction between the validity of the assignment, the right to proceeds, and, on the other hand, the possible duty to account for damages from any abuse or exercise of unauthorized powers.
 
 
 166
 Factually there are several things which operate in this direction. The first is that as to most of these assignments at least authority therefor goes back to orders entered by the Reorganization Court as early as 1962.[30]
 
 
 167
 Moreover, the Plan of Reorganization expressly recognized the existence of these claims as a distinct classification.[31] And the plan accorded continued vitality to that classification.[32]
 
 
 168
 Certainly, at least with respect to all of the advances made up to November 30, 1965 (the bank of the order dealing specifically with subsequent Bank Group financing),[33] we should regard these assignments as valid unless as to specific ones the person attacking them carries the burden of establishing invalidity.
 
 
 169
 But we disagree with the Bank Group that the presumptive validity of the assignments being upheld as we have done, this makes the sequestration of these accounts receivable and the bank accounts representing bank collections under them invalid. For the reasons pointed out in Part V, there was an ample basis for the Court to assure both an effective accounting for whatever has been done in the past and to secure an efficient exploitation of them in the future to marshall all of these within the protective control of the Court through the Receiver. The fact that ordinarily a security holder takes his own protective action and retains effective control over the assets pledged or mortgaged does not prevent a Reorganization Court from exerting its control where circumstances, as they did here, call for it. We are confident that Chief Judge Fulton, conscious of the responsibility of his whole Court, for the protection of the interests of all concerned in this case which has now become so complex, will respond effectively to any suggestions from pledgees, the Receiver, or otherwise to assure that the already dwindling assets are not further wasted by improvident or inefficient collection procedures.[34]
 
 
 170
 Thus we approve Judge Fulton's sequestration of the accounts receivable and the bank accounts representing collections under them.
 
 IX.
 MISCONDUCT AND SURCHARGES
 
 171
 The Bank Group challenges fervently those factual findings of Judge Fulton which in effect held the Bank Group No. 1 or No. 2 or GDFC guilty of wrongdoing.[35]
 
 
 172
 Briefly summarized, the Court held that the Bank Group without court authority, with no report to the court ostensibly in the name of collecting receivables, pledged receivables, took over the direction and control of the Company, forcing, in effect, management decisions to close retail outlets, go out of business except the collection business, dispose of assets without accounting. This went so far the court held that at one stage the Bank Group brought about the contract between the company and GDFC which was allowed to set up a pilot sales program, secure an assignment of part of the Beneficial lawsuit, and either through the Bank Group and its employees or under the arrangement with GDFC, large sums of money in effect were paid for the account of the Company in the form of salaries, commissions, and operating expenses, together with contributions amounting approximately to $60,000 to finance the Beneficial litigation.
 
 
 173
 Findings were also made as to Burden.[36] Nor were the findings of misconduct confined to Burden, the Bank Group, or GDFC. Both generally[37] and specifically[38] others were included.
 
 
 174
 These findings were, of course, stringent and at times took the form of an out-right conclusion, tentative at least, that the actions were done without judicial or corporate authority, without accounting, but except insofar as they may have induced the determination that the appointment of a Receiver was in order, do not bring about decisive consequences. They do, however, foreshadow the likelihood of an accounting because Judge Fulton in strong terms declared: "The court does not propose to let the foregoing misconduct pass unnoticed and unrectified. Each of the wrongdoers herein who can and should be surcharged will be surcharged at the appropriate time. The concept of compensation for faithless and disloyal service does not appeal to the court."[39]
 
 
 175
 We agree with the Bank Group (whether No. 1 or No. 2 or both and GDFC) and Burden who directly attack these findings that in our affirmance of Judge Fulton's order, we ought not to approve or disapprove of these findings or their legal consequences. We do hold — but all we hold — is that Judge Fulton has sufficient evidence before him to reach these tentative conclusions upon which at the appropriate time in the appropriate manner at the instance of the appropriate party, these persons might be called to account for a surcharge.[40]
 
 
 176
 Several factors point in this direction, not a one of which casts any reflection upon the manner in which Judge Fulton conducted the hearings or made the conclusions. He was after all under orders of this Court to hold the hearings, and both our orders and his affirmatively contemplated that the issues would develop day by day as new evidence was unturned. There are indications that the Company was mismanaged and the Plan not fulfilled, and the parties involved were under duty to account for their performances. The issues as framed initially did not fairly charge the Bank Group, GDFC, or the others with notice that they were put on the defensive. The hearings have served a healthy purpose. They have enabled us to act with some assurance about what the true state of affairs is. But we think that when businessmen and others are found to have engaged in improper conduct the conclusion ought finally to be reached only after proceedings which fairly advise in advance the nature of the charges with an opportunity for investigation and an adequate hearing. Considering the nature of our order and its rather stringent terms, it was not left open to Judge Fulton to decide whether hearing should be postponed to allow such specific notice and subsequent hearing. But since the possible surcharges are all in the future and may or may not ever come to pass, it is entirely in keeping with the demands of justice and the manner in which Judge Fulton characteristically performs his judicial functions, that these parties be afforded such notice and hearing when and as the proceedings are commenced. By our decision, they do not win nor do they lose. The Judge's tentative findings as to this aspect have served a limited, but vital, role. Neither by res judicata, collateral estoppel, nor law of the case are these factual issues or the legal consequences flowing from them determined one way or the other by our affirmance of Judge Fulton's order.
 
 
 177
 Other reasons also pointing in this direction are the need for a full exploration of the nature of the decisions made and the responsibility therefor which led to the closing of the retail stores, the withdrawal from active business operations, the disposition of saleable assets, and the like. As we indicated above (see Part VIII), it is entirely conceivable that holders of valid assignments of accounts receivable entitled to the use of collections thereunder may still be accountable for things done which abused or exceeded the authority granted by the pledge. This might be particularly true as to an outsider such as GDFC which lacks the standing of a secured pledgee, and which relationship to the Company and its affairs came into being either from the contract made with the Bank Group with Atlas, with the Company, or both. Likewise, there is considerable uncertainty as to the extent to which the Company, the Bank Group, or others could attempt to assign an interest in the Beneficial litigation, the control of which was expressly retained in the Trustee and the Reorganization Court. Included also are questions concerning the right of the Banks either directly or indirectly through GDFC to obtain effectually the benefit of the accounts receivable for the sums spent by them in the financing of the Beneficial litigation out of the expectation and hope that they would reap the benefit of such recoveries up to the extent of their unpaid loans to the Company. Likewise, there are problems concerning the duty to account and the sufficiency of the account by the secured pledgees.[41]
 
 
 178
 The upshot of it is that these charges of misconduct are neither upheld nor set aside. They remain for trial afresh when and if charges and hearings are initiated.
 
 X.
 ORDER ON REMAND
 
 179
 From this already overlong opinion, it is plain that many things heard in this painstaking hearing conducted by Judge Fulton and his findings which reflect careful judicial travail remain unsaid and undisclosed. We think the principles and conclusions reached adequately cover the situation for the guidance of all concerned. Since time really is now of importance to enable the July 13 hearing to go forward at the direction of Judge Fulton, the mandate of this Court will issue immediately.
 
 
 180
 Order in accordance with opinion.
 
 
 
 Notes:
 
 
 [1]
 At the time of this assignment, Atlas had pledged $20,718,000 in accounts receivable to secure certain loans. The accounts receivable were then assigned for collection to the Beneficial Finance Company, the proceeds to be used to liquidate the indebtedness (with Beneficial deducting a 25 per cent fee for collection). On December 31, 1961, $12,460,942.73 of this indebtedness remained, and the receivables still held by Beneficial then had a face value of $11,130,000. Atlas brought suit in New Jersey state court on March 25, 1964, for actionable failure to collect a very substantial amount (several million dollars) of the accounts receivable. This litigation is discussed below
 
 
 [2]
 The excess comes from a payment of $5,834.09 not in issue here
 
 
 [3]
 Wolff was also attorney for the co-proponent Burden. This rather unusual situation was known about and acquiesced in by all concerned
 
 
 [4]
 The entire paragraph 7 reads:
 "7. That the Assignment, executed by the Trustee on January 22nd, 1965, and heretofore approved by the Hon. Emett C. Choate, whereby the Trustee did transfer to the Continuing and Reorganized Company, all of the Debtor's, and all of the right title and interest of the said Trustee, in and to the Debtor's and all of the right, title and interest of the said Trustee, as such, in and to, property of every kind and character, whether real, personal or mixed and the assets of every kind and character, including among other things, but without in any manner limiting the generality of the foregoing, all real estate, all personal property, all mixed property, all choses in action, all patents and patent applications, all franchises, all trademarks, all names, all causes of action at law or in equity, all claims, counterclaims and set-offs, all right to use the name of said Debtor, (including the totally owned subsidiaries of the said Debtor) for every purpose, all books and records, all furniture, furnishings, equipment and fixtures, all stocks, bonds, notes, debentures and evidences of indebtedness, all evidences of beneficial interest or participation in property of every kind and character, whether real, personal or mixed, all cash on hand and in banks and on deposit, all insurance policies of every kind and character and all deeds and other title papers, shall vest in, and be and become the absolute property of the said Continuing and Reorganized Company, free and clear of all claims and interests of said Debtor, its totally owned subsidiaries, its stockholders, its convertible subordinate debenture bonds, and creditors, subject, however, to the payment of the expenses of administration, if any there be or if any are to be awarded, and all other payments which by the provisions of the said Plan of Reorganization, as amended and confirmed or Chapter X of the Acts of Congress relating to bankruptcy are required to be made in cash, shall become effective in accordance herewith, when the payments hereinbefore set out to be made in cash are actually paid by the Continuing and Reorganized Company."
 "8. That ATLAS SEWING CENTERS, INC., the Debtor and each of its totally owned subsidiaries, shall on or after the said day, i. e., provided for in paragraph 7, above, by proper conveyances, bills of sale, assignments and other instruments of transfer, convey, sell, assign and transfer to the said Continuing and Reorganized Company, full and absolute title to and shall make delivery to said Continuing and Reorganized Company of all of said property, of every kind and character, free and clear of all claims and interests of the said Debtor, its totally owned subsidiaries, its convertible subordinate debenture holders, its stockholders and creditors, subject, however, to the payment of any expenses of administration, if any there be and all other payments, which, by the provisions of the said Plan of Reorganization, as amended and confirmed, or Chapter X of the said Act, are required to be made in cash, with the exception of the creditors in Classes, 3, 4 and 5, who may be paid in accordance with the Order of this Court entered by the Hon. Emett C. Choate, on June 7th, 1965, wherein the Continuing and Reorganized Company was afforded a period of Eighteen through Twenty-four months, within which to discharge the sums due and owing to the creditors in Classes 3, 4 and 5, in amounts as hereinafter provided."
 
 
 [5]
 Primarily this means (1) the yet outstanding aspects of the Jones litigation, and (2) the suit then pending in the New Jersey state courts against the Beneficial Finance Company
 
 
 [6]
 In August 1966 one of the Group's members, Associates Discount Corporation, withdrew from the Group, as was its right under the November 30, 1965 Order Authorizing Interim Financing. Associates Discount then had reassigned to it all of the original security on its individual loans to Atlas, and started to collect on that security itself
 
 
 [7]
 The following is the text of a letter written on March 3, 1967, by Harold D. Rutig, vice president of the Miami Beach First National Bank, a member of the Bank Group. This letter accompanied a report filed pursuant to an order of the district court and is part of the record:
 "Dear Judge Fulton:
 "As was requested of me when I appeared as a witness in the Atlas Sewing Centers matter on March 2nd, I am enclosing the information relative to the open accounts of Atlas Sewing Centers at our two banks.
 "You will note that at the Coral Gables First National Bank, the account earmarked G.D.F.C. — Bank Group is the account utilized by the existing Bank Group that is operating Atlas at present.
 "Trusting this is the information you requested, I am
 "Respectfully yours
 "H. D. Rutig
 Vice-President"
 [Italics added]
 
 
 [8]
 The Bank Group phrases the following questions which it stated should be answered in the affirmative:
 
 
 [1]
 Did the Examining Judge err in ordering sequestration of the Bank accounts of, and the accounts receivable pledged to, the constituent members of the Bank Group and directing the Receiver to take over and make arrangements for the collection of those pledged receivables, and to take possession of the books, records, and accounts of the Bank Group?
 
 
 [2]
 Did the Examining Judge err in determining the Bank Group to be guilty of legal misconduct?
 
 
 [3]
 Did the Examining Judge err in authorizing and directing the Receiver to compromise and settle the pending litigation between the Debtor and Beneficial Finance Company of North Jersey?
 
 
 [9]
 Burden specifies numerous errors as follows:
 
 
 [1]
 The District Court erred in failing to grant the relief requested in the Application for Emergency Stay and Equitable Relief filed with the District Court in December 1966 for the reasons specified in Points One (1) through Nine (9) inclusive in the Brief in support of the Appeal from Judge Choate's Order of August 24, 1966
 
 
 [2]
 The District Court erred in failing and refusing to make a ruling on the issues raised in Points 3, 4, 5 and 9 of the Appellant's Brief filed in support of the Appeal from Judge Choate's Order of August 24, 1966 prior to a determination of the other issues
 
 
 [3]
 The District Court (Judge Fulton) erred in not recusing itself or declining to conduct the Fact Finding Hearing as directed by Judge Brown's Order of February 6, 1967 for the reason that several of the Orders complained of and under consideration were Orders that had been signed and issued by Judge Fulton and also because of his very strong feelings about this matter and his preconceived conclusion that the integrity of the Court had been impugned
 
 
 [4]
 The District Court erred in conducting atrial of Co-Proponent and the Bank Group and inquiry into the actions they took to salvage the situation after the Order of Substantial Consummation of July 1, 1965 when the Trustee and Mr. Wolff fraudulently turned over a practically hopeless situation to co-proponent, rather than conducting an impartial Fact Finding Hearing to determine whether or not the $1,003,000.00 was paid in as provided by the Plan of Reorganization, and if so, why the Company was not turned over to co-proponent in January of 1965.
 
 
 [5]
 The District Court erred in refusing to permit appellant (co-proponent) to introduce evidence and to lay a sufficiently broad predicate
 
 
 [6]
 The District Court erred in ordering sequestration of the bank accounts of, and the accounts receivable pledged to, the constituent members of the Bank Group, and directing the Receiver to take over the bank accounts and pledged receivables and to take possession of the books, records, physical facilities and operation of the Bank Group and co-proponent, which action prior to a determination of the legal rights of said parties on appeal is confiscatory, destructive of the legal entity and constitutes a taking of property without due process of law in violation of Article XIV of the Constitution of the United States
 
 
 [7]
 That the Findings of Fact and Conclusions of the Examining Judge are for the most part contrary to and unsupported by the law and the evidence, particularly Findings Numbers: 4, 5, 6, 11, 13, 19, 22, 24, 27, 28, 31, 33, 35, 36, 39, 43, 46, 47, 49, 53, 55, 56, 57, 59, 62, 63, 65, 66, 67, 69, 70, 73, 75, 76, 77, 80, 81, 88, 90, 91, 93, 97, 101, 102, 103
 
 
 [10]
 Appearing and arguing were Burden and his associate counsel, counsel for the Bank Group, the Receiver, the Department of Justice Tax Division, and the SEC. The arguments consumed over five hours. Upon the call we announced that because of the long complex background of the case and the proceedings and the desirability of announcing decision if at all possible consistent with the demands of justice, prior to the July 13, 1967, adjudication show cause date, the Court in its preargument study has prepared in advance the above portions of this opinion
 
 
 [11]
 In paragraph 4(a) (ii), we specified the matters to be heard, including specifically the charge that:
 "Subsequent to December 31, 1964, the Trustee, the District Court, or others acting alone or together interfered unduly in management of the Company to the detriment of the Company, its creditors, resulting in a shortage in working capital and funds jeopardizing the ultimate consummation of the plan."
 
 
 [12]
 See Burden's assignments of error, Nos. 1 and 2 heretofore stated in full in the preamble of this opinion
 
 
 [13]
 This is quoted in the text above just prior to note 1
 
 
 [14]
 See Burden's assignments of error Nos. 4 and 6, and Bank Group's assignment of error No. 1, heretofore set forth in full in the preamble of this opinion
 
 
 [15]
 See, e. g., 6A Collier on Bankruptcy, 14th Ed. at 672, dealing with reservations under Section 224(2) of the Act (11 U.S. C.A. § 624(2)). The reservation in the instant Plan was in the conventional form, but Collier goes on to point out, page 675, that this reservation does not contemplate that jurisdiction is to be retained * * * over collateral issues, or for complete control of the debtor or its successor indefinitely for the purpose of passing upon the business activities of the rehabilitated enterprise * * *."
 An oft-cited case is North American Car Corp. v. Peerless Weighing & Vending Machine Corp., 2 Cir., 1944, 143 F.2d 938, in which Judge Charles E. Clark declared for that court: "We have had occasion before to deplore the tendency of District Courts to keep reorganized concerns in tutelage * * * by orders purporting to retain jurisdiction for a variety of purposes, extending from complete supervision of the new business to modifications of detail in the reorganization. * * * Since the purpose of reorganization clearly is to rehabilitate the business and start it off on a new and to-be-hoped-for more successful career, it should be the objective of courts to cast off as quickly as possible all leading strings which may limit and hamper its activities and throw doubt upon its responsibility."
 Others of similar import cited include:
 Reese v. Beacon Hotel Corp., 2 Cir., 1945, 149 F.2d 610.
 In Re Flatbush Ave.-Nevins St. Corporation, 2 Cir., 1943, 133 F.2d 760.
 Towers Hotel Corp. v. Lafayette National Bank of Brooklyn in New York, 2 Cir., 1945, 148 F.2d 145.
 Bakers Share Corp. v. London Terrace, Inc., 2 Cir., 1942, 130 F.2d 157.
 Clinton Trust Co. v. John H. Elliott Leather Co., 2 Cir., 1942, 132 F.2d 299.
 Matter of Ambassador Hotel Corp., 2 Cir., 1942, 124 F.2d 435.
 In Re Elless Co., 6 Cir., 1949, 174 F.2d 925.
 Claybrook Drilling Company v. Divanco, Inc., 10 Cir., 1964, 336 F.2d 697.
 In Re Utilities Power and Light Corporation, 7 Cir., 1942, 125 F.2d 343.
 In Re Technical Marine Maintenance Co., Inc., 3 Cir., 1948, 169 F.2d 548.
 Wharton et al. v. Farmers & Merchants Bank of Green Ridge, Mo. et al., 8 Cir., 1941, 119 F.2d 487.
 
 
 [8]
 C.J.S. Bankruptcy § 45, page 706
 
 
 [16]
 § 629. Acts deemed consummating plan; order declaring consummation; substantial alteration or modification
 (a) A plan shall be deemed to have been substantially consummated if, insofar as applicable, each of the following events has occurred:
 (1) transfer, sale or other disposition of all or substantially all of the property dealt with by the plan pursuant to the provisions of the plan;
 (2) assumption of operation of the business and management of all or substantially all of the property dealt with by the plan by the debtor or by the corporation used for the purpose of carrying out the plan; and
 (3) commencement of the distribution to creditors and stockholders, affected by the plan, of the cash and securities specified in the plan as provided for in section 624 of this title.
 (b) Upon notice to the trustee, the debtor, the Securities and Exchange Commission and such other persons as the judge may designate, the trustee, the debtor in possession, the corporation to which the assets of the debtor are to be transferred under the plan, or any other party in interest may apply to the judge for an order declaring the plan to have been substantially consummated under the provisions of subdivision (a) of this section.
 (c) When a plan has been substantially consummated as defined in subdivision (a) of this section, or an order has been entered under subdivision b of this section, the plan may not thereafter be altered or modified if the proposed alteration or modification materially and adversely affects the participation provided for any class of creditors or stockholders by the plan. July 1, 1898, c. 541, § 229, as added July 7, 1952, c. 579, § 26, 66 Stat. 431.
 
 
 [17]
 The intent of Congress in enacting Section 229, is explained in House Report # 2320 on S.223U4, 82nd Congress, Second Session (1952) (16), U.S.Code Congressional and Administrative News, p. 1977. Congress felt it was necessary to preclude any substantial changes in the Plan of Reorganization beyond a certain point, so that "creditors extending credit after confirmation" * * * would be able "to determine their rights until entry of the final decree, which in many cases occurs more than one year after confirmation." The House Report recognized that "uncertainties make it difficult to get credit, make contracts, and receive such commitments (which may include the underwriting of securities under the plan) as may be necessary to consummate the plan." * * * The House Report goes on to state that it was felt necessary to have an absolute bar time for substantial alterations in the Plan of Reorganization so that "[n]ew securities may thereafter be issued and new credit extended with confidence that, after such fixed time, there would be no material and adverse change in the confirmed plan." 6A Collier op. cit. 712-3
 6A Collier, op. cit., at 714, in analyzing the purpose of this section states:
 "The effect of there being this possibility of change could interfere with the normal operation of the reorganized business; and, if the business is to prove successful, thus accomplishing one of the basic aims of Chapter X, then obviously any factor that tends to disrupt or prevent normal business operations should be either eliminated altogether or curtailed as much as possible. Within the routine operations, obtaining credit, secured or unsecured, issuance of securities, expanding operations, and the like. In all of these matters there is the necessity of convincing third persons, outsiders with whom the corporation must do business, that the risk involved in engaging into relations of any kind with the reorganized company are as minimal as can be under the circumstances. Unnecessary risks should by all means be avoided. As was stated in the House Report, one such unnecessary risk was that of change in the reorganization plan at a time when dealings with other concerns and parties became essential for continued operational success."
 
 
 [18]
 This is not to prejudge or intimate prejudgment upon the reserved issue of adjudication now set for the show cause hearing of July 13, 1967. We refer to this likelihood only insofar as it bears upon a demonstrated failure to complete the Plan not only as to the past, but the present and probably the future as well
 See 6A Collier on Bankruptcy, 14 Ed., 1965, §§ 11.11 and 11.13.
 
 
 [19]
 The order was based in part upon the following specific findings:
 
 
 [74]
 Neither Burden, Bank Group No. 1, nor anyone else has ever accounted to the Court for the unused security deposits, inventory of sewing machines and other merchandise, fixtures and equipment and other assets of the closed outlets * * *
 
 
 [92]
 There is no likelihood that the plan will be consummated. Neither Burden nor anyone else has offered to provide the monies now needed to consummate the plan. Burden himself testified that under present circumstances he would not put another nickel in the company. Mergner likewise testified that neither he nor his associates would put any money into the company unless at least 80% of the stock in the reorganized company could be obtained. The plan only provides for 51% of the stock to be issued to the co-proponent and there is no evidence that the remaining stock needed could be acquired from other sources
 
 
 [93]
 Since the company no longer has any business activities or any prospects for the infusion of additional monies, and its liabilities far exceed its assets, adjudication seems inevitable
 It was based also upon these conclusions of law:
 
 
 [9]
 A receiver for the debtor-reorganized company is urgently and immediately needed to marshal and protect Atlas' assets and to represent it in litigation
 
 
 [10]
 It is unreasonable to expect that the plan can be consummated. It is equally unreasonable to expect that Atlas can be reorganized under any modification of the plan or under any substitute or different plan
 
 
 [20]
 See Judge Fulton's implementing orders calling for reports from the following: Trustee Ray, Burden, Brother International Corporation, Burden on behalf of Woodstock Group, Charlotte Blackburn, Rutig and members of Bank Group No. 1 and Bank Group No. 2, Associates Discount Corporation, Mergner, GDFC. Reports have since been filed and by special order we made them a part of the record before us on this proceeding. Since they have not yet been checked, verified, or analyzed by the Receiver, we have taken note of them, but have not factually based our findings thereon in any way
 
 
 [21]
 It is uncontradicted that the Company owes post-petition administrative expenses for withholding taxes, etc. to the United States Government of approximately $175,000
 
 
 [22]
 See 6 Collier on Bankruptcy, 14th Ed., par. 3.05, p. 442 (and cases therein cited), which reads as follows:
 "* * * /I/t is not surprising to find that when possession of the debtor's property is held by a creditor, such as a pledgee or mortgagee, whose claim is not in dispute and who does not dispute the debtor's title but claims the right to hold the property and use it as security, the courts have generally ruled that this possession is not sufficient to defeat the reorganization court's summary jurisdiction either to enjoin the use of the security as by sale or to retake possession thereof."
 
 
 [23]
 See 11 U.S.C.A. § 514 (Section 114 of the Bankruptcy Act)
 
 
 [24]
 See Judge Fulton's Questions Nos. 3A, 3B, 3C, 5, 5A, 5B, 5C, as set forth in the preamble in this opinion
 
 
 [25]
 In more somber language the Court had just stated: "At the present time, nearly $3,000,000 would be required to consummate the plan and pay the terrific obligations which have accrued since the Order of Consummation
 "Atlas has virtually no assets other than the claim against Beneficial, its rapidly dwindling accounts receivable, and a few small bank accounts which total about $16,500. Since May or June of 1966, all of its outlets have been closed, it has made no sales of any kind, has had no inventory, and is engaged in no activity other than the collection of a few of its installment sales accounts, most of which had been pledged to lending institutions."
 
 
 [26]
 See Finding 92, footnote 19
 
 
 [27]
 The order in effect calls for a hearing to determine whether an order should be entered "either adjudicating the debtor or bankrupt and directing that bankruptcy be proceeded with `or' dismissing the proceedings."
 See 11 U.S.C.A. § 636 (Section 236 of the Bankruptcy Act).
 
 
 [28]
 On argument the Receiver's counsel suggested that the Receiver might want additional time in order to make a proper inventory of assets, if any, and an analysis of the reports filed pursuant to Judge Fulton's order
 
 
 [29]
 We discuss this specific problem in Part IX post and mention it here only to fill out what we conceive to have been Judge Fulton's findings respecting the pledged accounts receivable and the actions of the Bank Group, GDFC, etc
 
 
 [30]
 These were, we understand Trustee's exhibits 2A-2Q, inclusive, in the hearing below. These were identical except for a difference in date, lending bank, etc. The petition and order provided for the advance by the lending institution of 70% of the unpaid balance of the paper, the 30% remaining to be deemed a reserve and requiring substitution of paper in default exceeding 60 days. Collections were to be made by the Debtor subject to immediate remittance and current detailed collection reports
 
 
 [31]
 See, e. g., "Classes of creditors of the debtor" subpar. 9 of the Plan:
 "9. Bank loans obtained by Trustee with Court approval; the Trustee with the approval of the Court entered into various and sundry agreements with Banks whereby the estate borrowed various sums of money and secured said loans by assigning consumer retail contracts. These loans facilitated the Trustee in the operation of the business during the administration of the estate."
 
 
 [32]
 See Art. VI Creditors, Parties and Securities affected by the plan and provisions with respect to them: * * *
 "D. The creditors comprising Class 9 will be allowed to retain their liens and secured status and the Continuing and Reorganized Company will recognize these contracts and allow them to be discharged in their normal, regular manner."
 
 
 [33]
 The appendix to the Bank's brief gives the detail and gross totals as to all pledges (members as well as Associates Discount Corporation and others) as follows:
 Advances up through
 November 30, 1965 $2,461,230.32
 Advances December 1, 1965
 through January 31, 1967 466,975.14
 _____________
 Total advances $2,928,205.46
 Less:
 Collections through
 January 31, 1967 937,636.37
 _____________
 Balance due $1,990,569.09
 
 
 [34]
 From argument and briefs we understand that arrangements are already being worked out with Associates Discount Corporation for the efficient handling of collections. Every reason suggests the feasibility of similar, practical arrangements by and with the Bank Group. As the Court gets a grasp of the complicated dollar accounting problems, it is entirely likely also that it will determine to release all or parts of specific bank accounts now sequestered and which the Bank Group earnestly contends are the sole property of the respective banks and in no way owned by the Company
 
 
 [35]
 The Bank Group now insists it is neither No. 1 nor No. 2, just Bank Group. In view of further proceedings on this phase we regard this as unimportant
 
 
 [36]
 The District Court's Finding 75 states:
 "The Court finds that Burden breached his fiduciary obligations to the Court and the company by failing to disclose the above matters."
 
 
 [37]
 See, e. g., Finding 69:
 "* * * the record * * * abounds with evidence of the misdeeds of some Court and company officers and other parties involved with the company. Not only have these persons failed to make full disclosure to the Court of the facts and circumstances as they develop, but also, they have affirmatively attempted to secrete some of their activities from the Court. The most that can be said of these participants is that their loyalties went to the highest bidder rather than to the Court. Their misdeeds have effectively destroyed whatever chances might otherwise have existed for successful reorganization. Many of the participants herein seem to have assumed that their authorities were unlimited, that they could do what they wanted to, when they wanted to, and that they were answerable to no one for their actions."
 
 
 [38]
 This also included Charlotte Blackburn, Trustee Ray, Mergner, GDFC
 After discussing the individual cases, the Court found in No. 88:
 "The defalcations, divided loyalties and usurpation by each of the persons previously discussed served to undermine the confidence of each in the other and the combined effect has nullified all hopes for reorganizing the company."
 
 
 [39]
 Finding 89
 
 
 [40]
 We express no opinion or conclusion as to the binding effect of these findings on others who have not appealed. We expressly decline to pass upon those concerning the Trustee Ray or Charlotte Blackburn since these are a part of the criminal and civil contempt charges still pending and as to which we shall make no judgment until the hearing of those cases
 
 
 [41]
 The Bank Group in effect argues that there is no need, and hence apparently no duty, to account as a secured pledgee since on the estimates of nearly everyone of competence it seems quite likely that out of a balance of nearly $2,000,000 remaining unpaid on the secured bank loans (see note 33, supra) only about $500,000 will at best be recovered. This argument is not very impressive to an equity court
 
 
 ON PETITION FOR REHEARING EN BANC
 PER CURIAM:
 
 181
 The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, Rule 25a, subpar. (b), the Petition for Rehearing En Banc is denied.